PATRICIA HARRIS, as Personal
Representative of the Estate of
GERALD HARRIS,

        Plaintiff,

        v.

R.J. REYNOLDS TOBACCO
COMPANY, et al.,

        Defendants.

Case No.:    3:09-cv-13482
CHIEF JUDGE EDMUND SARGUS, JR.

### OPINION AND ORDER

This is an "*Engle*-progeny"[1] lawsuit by Plaintiff Patricia Harris ("Plaintiff"), as Personal

Representative of the Estate of Gerald Harris ("Mr. Harris"), against three cigarette manufacturers,

Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company

(collectively, "Defendants"). The case is before the Court on Defendants' Renewed Motion for

Judgment as a Matter of Law on All Claims or in the Alternative, Motion for New Trial (Doc.

178), and Defendants' Motion to Alter or Amend the Judgment (Doc. 179). Plaintiff has responded

to both motions. (Doc. 182; Doc. 183). The Court has also reviewed the parties' supplemental

briefs. (Doc. 201; Doc. 202). The matter is thus ripe for a decision. For the reasons set forth below,

Defendants' Renewed Motion for Judgment as a Matter of Law on All Claims and alternative

---

[1]    The Court refers to lawsuits filed pursuant to the Florida Supreme Court's opinion in *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246 (Fla. 2006) (*Engle III*), as "*Engle*-progeny cases." In *Engle III*, the Florida Supreme Court decertified a statewide class of smokers and their survivors, but allowed members of the decertified class one year in which to file individual lawsuits, referred to as "the *Engle* savings period." *Id.* at 1277. For a detailed history of the *Engle* litigation, see *Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324, 1326-29 (11th Cir. 2010), and *Waggoner v. R.J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011). The Court presumes the reader's familiarity with the *Engle*-progeny litigation.

Motion for New Trial is due to be denied. Defendants' Motion to Alter or Amend the Judgment is due to be granted to the extent that the Court will amend the judgment to reflect each party's comparative fault. Otherwise, the Motion to Alter or Amend Judgment is due to be denied.

## I. Background

On September 12, 2013, Plaintiff filed an Amended Complaint against the Defendants pursuant to *Engle III*. (Doc. 5). Plaintiff alleged that the Defendants' cigarettes were responsible for Mr. Harris's coronary heart disease (CHD) and oral cavity cancer, as well as the lung cancer that ultimately claimed his life. Plaintiff sought wrongful death and survival damages under theories of negligence, strict liability, fraudulent concealment, and conspiracy to conceal.

Following a trial, the jury returned a verdict for Plaintiff on the claims of negligence and strict liability, but not on the claims of fraudulent concealment and conspiracy to conceal. (Doc. 143). In reaching its verdict, the jury determined as a threshold matter that Mr. Harris was addicted to cigarettes containing nicotine. (*Id.* at 1). The parties stipulated that Mr. Harris's CHD manifested on or before the *Engle* class cutoff date of November 21, 1996 (*see* Doc. 121 at 35 ¶ 2; Doc. 163 at 180), but the jury determined that Mr. Harris's addiction to cigarettes was not the cause of his heart disease (Doc. 143 at 2 ¶ 3). However, the jury found that while Mr. Harris's oral cavity cancer had *not* manifested by the cutoff date (*id.* at 2 ¶ 2), Mr. Harris's addiction to cigarettes *was* the cause of the oral cavity cancer (*id.* at 2 ¶ 3). The jury further found that Mr. Harris's addiction to cigarettes was the cause of the lung cancer that resulted in his death. (*Id.* at 4 ¶ 6).[2]

---

[2]     The verdict form did not ask the jury to determine whether Mr. Harris's lung cancer manifested on or before November 21, 1996, but Defendants did not litigate that specific point or object to the proposed jury instructions or verdict form on that basis. (*See* Doc. 121).

In accordance with the Court's instructions, the jury awarded two sets of compensatory damages: one for the diseases that *did not* cause Mr. Harris's death (i.e., oral cavity cancer)[3] and one for the diseases that *did cause* Mr. Harris's death (i.e., lung cancer). The Court reasoned that damages for the injuries *not resulting* in Mr. Harris's death reflected survival damages, while damages for the injuries that *did result* in Mr. Harris's death reflected wrongful death damages. With respect to oral cavity cancer, the jury awarded $1,326,650.00 in survival damages (Doc. 143 at 12 ¶ 17), assigning 60% of the fault to Mr. Harris, 15% each to Philip Morris and R.J. Reynolds, and 10% to Lorillard (*id.* at 3 ¶ 5).[4] With respect to Mr. Harris's lung cancer, the jury awarded $400,000.00 in wrongful death in damages (*id.* at 12 ¶ 16), assigning 70% of the fault to Mr. Harris and 10% each to Philip Morris, R.J. Reynolds, and Lorillard (*id.* at 4 ¶ 7).[5] Neither of the damage verdicts distinguished between economic damages (such as medical bills) and non-economic damages (such as pain and suffering). The jury determined that punitive damages were not warranted. (*Id.* at 13).

Two weeks after the trial ended, Defendants filed a "Motion for Judgment in Accordance with the Jury's Verdict." (Doc. 157). Defendants argued that based on the verdict, Mr. Harris was not an *Engle* class member because of the lack of unity between the disease that met the cutoff date requirement and the disease that was caused by the addiction to cigarettes. As noted above, the jury found that the tobacco-related illness that manifested by the *Engle* class cutoff date (CHD) was not caused by Mr. Harris's addiction to cigarettes, but that the tobacco-related illness that *was* caused by Mr. Harris's addiction to cigarettes (oral cavity cancer) had not manifested by the *Engle*

---

[3]    *See* Doc. 141 at 24; Doc. 143 at 3.

[4]    Thus, Plaintiff's net recovery for the diseases *not* resulting in Mr. Harris's death was $530,660.00.

[5]    Thus, Plaintiff's net recovery for the diseases that *did result* in Mr. Harris's death was $120,000.00.

class cutoff date. The Court determined that Mr. Harris was an *Engle* class member nonetheless. (Doc. 174). The Court explained that in deciding class membership, it was bound by *Engle III*'s treatment of class representative Angie Della Vecchia. *Id.* at 4-5. In *Engle III*, the Florida Supreme Court held that Della Vecchia was properly included as a class member "despite a mismatch between the disease that timely manifested (COPD) and the disease for which legal cause was found (lung cancer)." *Id.* at 6 (citing *Engle III*, 945 So. 2d at 1256, 1276). This Court reasoned that because Plaintiff stood in Della Vecchia's shoes, *id.* at 5, Mr. Harris also qualified as an *Engle* class member even if the tobacco-related disease that manifested by the *Engle* cutoff date was different from the tobacco-related disease for which the jury found causation, *id.* at 10. Thus, the Court denied Defendants' motion.

Thereafter, the Court entered judgment in favor of Plaintiff and against Defendants in the amount of $1,726,650.00. (Doc. 175). The original judgment reflected the total amount of damages found by the jury but did not reflect the degree of Mr. Harris's comparative fault. Shortly thereafter, Defendants filed the two instant motions.

## II.     Defendants' Renewed Motion for Judgment as a Matter of Law on All Claims and Alternative Motion for New Trial

### A.  Standard

The standard for granting a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is the same as the standard for granting the pre-submission motion under Rule 50(a). *Chaney v. City of Orlando, Fla.,* 483 F.3d 1221, 1227 (11th Cir. 2007) (citation omitted). Under that standard, "a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Id.* A court "should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1192 (11th Cir. 2004). "The issue is not whether

4

the evidence was sufficient for [the losing party] to have won, but whether the evidence was sufficient for it to have lost." *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1265 (11th Cir. 2008).

A court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

> A losing party may ... move for a new trial under Rule 59 on the grounds that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair ... and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury."

*McGinnis v. Am. Home Mortg. Servicing, Inc.,* 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940)). Thus, under Rule 59(a), a district court may grant a new trial "if in [the court's] opinion, the verdict is against the clear weight of the evidence ... or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Id.* (quoting *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir. 1984)). A district court's decision whether to grant or deny a motion for a new trial is reviewed for abuse of discretion. *Middlebrooks v. Hillcrest Foods, Inc.* 256 F.3d 1241, 1247 (11th Cir. 2001).

### B. Whether Mr. Harris Is a Member of the *Engle* Class

Defendants' first argument is that Mr. Harris was not a member of the *Engle* class because the tobacco-related disease that manifested by the *Engle* cutoff date (CHD) and the tobacco-related disease for which the jury found causation (oral cavity cancer) were not one and the same. (Doc. 178 at 3-5). As recounted earlier, this is the same argument that Defendants raised in their Motion for Judgment in Accordance with the Jury's Verdict (Doc. 157), and which the Court denied in a written order (Doc. 174). The Court remains unmoved. For the reasons set forth in the Court's

5

previous opinion, the Court finds that Mr. Harris satisfied the requirements for *Engle* class membership by showing that a tobacco-related disease (CHD) manifested by the *Engle* cutoff date and that his addiction to smoking cigarettes was the cause of another tobacco-related disease (oral cavity cancer). (*See* Doc. 174). That is so because in *Engle III* the Florida Supreme Court held that class representative Angie Della Vecchia was a class member despite a mismatch between the diseases that met the cutoff date requirement (COPD and hypertension) and the disease that was caused by her addiction to cigarettes (lung cancer). *Engle III*, 945 So. 2d at 1255-56, 1276.[6]

The Court briefly writes to address two further points. First, Defendants argue that the Court erred in relying on *Engle III*'s treatment of Della Vecchia because "the defendants never objected to … Della Vecchia as a proper member of the class." (Doc. 178 at 4) (quoting *Engle III*, 945 So. 2d at 1256 n.2). Thus, Defendants argue that *Engle III*'s decision to count Della Vecchia as a class member is not controlling because the issue was uncontested. But Defendants ignore that later in the opinion, notwithstanding Footnote 2, the Florida Supreme Court engaged the very question of whether Della Vecchia was a class member, including with respect to the issue of the cutoff date. *Id.* at 1274-76. The Florida Supreme Court reversed a lower appellate court's decision that Della Vecchia was not a class member. *Id.* at 1276. In doing so, the Florida Supreme Court held that Della Vecchia was a class member because there was evidence that COPD and hypertension had manifested by the cutoff date, *id.* at 1276, even though those were not the diseases for which the jury found causation, *id.* at 1255-56. Contrary to Defendants' argument,

---

[6]     Because this Court is exercising diversity jurisdiction, it has a duty to apply Florida substantive law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Where the highest court in the state – in this case, the Florida Supreme Court – has spoken on a topic, this Court must follow its rulings, turning to intermediate appellate courts in the absence of its guidance, unless persuasive evidence exists that the Florida Supreme Court would rule otherwise. *See, e.g., Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011).

both Florida courts and federal courts presiding over *Engle*-progeny cases have regarded *Engle III*'s decision about Della Vecchia's class membership to be instructive, if not controlling. *R.J. Reynolds Tobacco Co. v. Ciccone*, 190 So. 3d 1028, 1036 (Fla. 2016) ("This Court's discussion of class representative Della Vecchia is instructive in considering the necessary showing for establishing *Engle* class membership."); *R.J. Reynolds Tobacco Co. v. Ciccone*, 123 So. 3d 604, 614 (Fla. 4th DCA 2013) (quoting *Engle III*, 945 So. 2d at 1276) ("In reaching this conclusion, we are guided by the Supreme Court's treatment of one of the *Engle* class representatives, Angie Della Vecchia. Although Della Vecchia remained undiagnosed with lung cancer until 1997, the *Engle* court found her class membership to be sufficiently proven since, much like the plaintiff in the case at hand, 'it was noted by her doctors in early 1997 that she had a past medical history of 'COPD' and significant hypertension.'"), *aff'd in part, rev'd in part on other grounds*, 190 So. 3d 1028; *Frazier v. Philip Morris USA, Inc.*, 89 So. 3d 937, 945 (Fla. 3d DCA 2012) (looking to *Engle III*'s treatment of Della Vecchia for guidance on the question of class membership); *see also Berger v. Philip Morris, USA, Inc.*, 49 F. Supp. 3d 1065, 1071 (M.D. Fla. 2014) (same). Likewise, this Court is also guided by *Engle III*'s treatment of Della Vecchia. As with Della Vecchia, Mr. Harris is an *Engle* class member despite the lack of unity between the tobacco-related disease that manifested by the cutoff date and the tobacco-related disease for which the jury found causation.

Second, Defendants contend in their supplemental brief that Mr. Harris is not a class member under the Fourth District Court of Appeal's decision in *Philip Morris USA, Inc. v. McCall*, 234 So. 3d 4 (Fla. 4th DCA 2017). (*See* Doc. 202 at 2-3). Defendants point to a passage from *McCall* reciting the procedural background of the *Engle* litigation. (*Id.*) (citing *McCall*, 234 So. 3d at 10). In that passage, *McCall* merely observed that "[t]he Florida Supreme Court later confirmed that the class recertification date was the class membership cut-off date" of November 21, 1996,

and that "[b]ased on the foregoing, the filing of the *Engle* lawsuit tolled the statute of limitations for *Engle* class member causes of action accruing no earlier than May 5, 1990 (four years before the filing date) and no later than November 21, 1996." *McCall*, 234 So. 3d at 10 (citations omitted). Defendants contend that *McCall* stands for the proposition that to qualify as an *Engle* class member, the tobacco-related disease caused by an addiction to cigarettes must be the same as the tobacco-related disease that manifested by the cutoff date. However, *McCall* does not go so far as to address that precise question. Accordingly, *McCall* does not alter this Court's interpretation and application of *Engle III*.

### C. Whether Plaintiff Can Recover Both Wrongful Death and Survival Damages Based on Separate Injuries

Defendants' second argument is that the Court erred in determining that Plaintiff could recover damages under both Florida's Wrongful Death Act, §§ 768.16– 768.27, Fla. Stat., as well as under Florida's survival statute, § 46.021, Fla. Stat. (Doc. 178 at 5-7). As noted earlier, the Court determined that Plaintiff could recover survival damages with respect to the diseases that did *not* cause Mr. Harris's death, i.e., oral cavity cancer, as well as wrongful death damages with respect to the diseases that *did* cause Mr. Harris's death, i.e., lung cancer.

Defendants recognize that the Court has already ruled Plaintiff may recover both survival damages and wrongful death damages, but they raise the argument to preserve it for appellate review. (Doc. 178 at 5 n.2). During trial, the Court had two dialogues with the parties about the issue. (Doc. 182-1; Plaintiff's Ex. A); (Doc. 182-2; Plaintiff's Ex. B). Both sides acknowledged at the time that there was no Florida case directly on point. (Doc. 182-1 at 7, 9-10; *see also* Doc. 116 at 2). After reviewing the case law, the Court orally ruled that Plaintiff could recover both types of damages where there were discrete injuries and one injury resulted in death but the others did not. (Doc. 182-2 at 3).

8

While it is a close question, the Court remains persuaded that where a tortfeasor's conduct causes multiple injuries, one of which results in death and at least one of which does *not* result in death, a plaintiff can recover wrongful death damages with respect to the fatal injury as well as survival damages with respect to the non-fatal injury. But the Court believes its decision warrants further explanation. In reaching this decision, the Court is informed not only by the parties' post-trial briefs, but also by the parties' bench briefs concerning the issue. (*See* Doc. 103; Doc. 116).

The Court begins with the relevant statutes. Florida's survival statute states: "No cause of action dies with the person. All causes of action survive and may be commenced, prosecuted, and defended in the name of the person prescribed by law." § 46.021, Fla. Stat. A survival action allows a survivor to stand in the decedent's shoes and recover compensation for the damages that accrued while the decedent was still alive, such as the decedent's pain and suffering, medical expenses, and lost earnings. *Martin v. United Sec. Servs., Inc.*, 314 So. 2d 765, 767 (Fla. 1975). A survival action is appropriate where "a personal injury caused by another's tortious conduct does not result in death, and the injured person later dies due to other causes." 4 Fla. Forms of Jury Instr. § 145.02.

Florida's Wrongful Death Act creates a cause of action

> [w]hen the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person, including those occurring on navigable waters, and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued....

§ 768.19, Fla. Stat. In contrast to a survival claim, a wrongful death claim focuses on the losses suffered by the estate or the survivors – not the decedent – by allowing recovery for such things as the survivors' loss of support services, loss of consortium, the survivors' own pain and suffering, as well as medical bills or funeral costs borne by the survivors or the estate. § 768.21, Fla. Stat.; *Martin*, 314 So. 2d at 318-19. Notably, however, the Wrongful Death Act allows the estate and survivors to recover only those damages "caused by the injury resulting in death." § 768.20, Fla.

9

Stat. (emphasis added). In other words, the Wrongful Death Act does not encompass damages caused by any other injury *not* resulting in death.

At the center of this dispute is a sentence in § 768.20, Fla. Stat., which provides: "[w]hen a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of death shall abate." This sentence – which the Court refers to as the "abatement clause" – precludes a survival action for a personal injury that results in the decedent's death. "[W]hen death is the result of a personal injury, the law of Florida essentially substitutes a statutory wrongful death action for the personal injury action that would otherwise survive under section 46.021." *Niemi v. Brown & Williamson Tobacco Corp.*, 862 So. 2d 31, 33 (Fla. 2d DCA 2003). Before adoption of the current Wrongful Death Act in 1972, a survivor could maintain both causes of action for the same injury if it resulted in death: (1) a survival action for the decedent's alleged damages, and (2) a wrongful death action on behalf of the survivors. *Martin*, 314 So. 2d at 767. The abatement clause eliminated that duplicity by "merg[ing] the survival action for personal injuries and the wrongful death action into one lawsuit." *Id.* at 768.[7] If it is unclear or disputed whether a personal injury resulted in the decedent's death, a plaintiff may plead, as alternative and inconsistent causes of action, both a survival claim and a wrongful death claim. *Capone v. Philip Morris USA, Inc.*, 116 So. 3d 363, 378 (Fla. 2013); *Niemi*, 862 So. 2d at 34 (citations omitted) ("It is not uncommon for a plaintiff in a lawsuit to be uncertain whether the

---

[7]    In merging the two actions, the legislature consolidated certain items of survival damages – loss of earnings, medical expenses, and funeral expenses – under the new Wrongful Death Act. *Id.* at 769. Additionally, "[t]he claim for pain and suffering of the decedent from the date of injury to the decedent was eliminated. Substituted therefor was a claim for pain and suffering of close relatives, the clear purpose being that any recovery should be for the living and not for the dead." *Id.* Bear in mind, however, that the Wrongful Death Act allows recovery of such damages only to the extent "caused by the injury resulting in death." § 768.20, Fla. Stat.

alleged personal injury resulted in death.... When this issue is unresolved, the law permits a plaintiff to allege alternative theories.").

"[T]he intent of the amended Wrongful Death Act is that 'a separate lawsuit *for death-resulting personal injuries* cannot be brought as a survival action under Section 46.021." *Williams v. Bay Hosp., Inc.*, 471 So. 2d 626, 629 (Fla. 1st DCA 1985) (emphasis added) (quoting *Martin*, 314 So. 2d at 770). Importantly though, the Florida Supreme Court observed that "the survival statute is still applicable to preserve other actions which the decedent may have brought or was bringing prior to his death." *Martin*, 314 So. 2d at 770 n.18. "[T]he paramount purpose of the Florida Wrongful Death Act is to prevent a tortfeasor from evading liability for his misconduct when such misconduct results in death." *Variety Childrens Hosp. v. Perkins*, 445 So. 2d 1010, 1012 (Fla. 1983); *see also* § 768.17, Fla. Stat. ("It is the public policy of the state to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer. Sections 768.16-768.26 are remedial and shall be liberally construed.").

The parties do not disagree that under the abatement clause, a survivor cannot recover both wrongful death damages and survival damages for the same injury (e.g., Plaintiff does not contend that, in addition to wrongful death damages, she can also recover survival damages caused by Mr. Harris's death-resulting lung cancer). Where the dispute arises is when a tortfeasor's single course of conduct causes multiple injuries, one of which results in death and at least one of which does not result in death. Here, the Defendants engaged in a single course of conduct of manufacturing and selling unreasonably dangerous cigarettes. However, that course of conduct produced several injuries in Mr. Harris: lung cancer, which resulted in his death, and oral cavity cancer, which did not result in his death.

Defendants argue that if a single course of conduct causes multiple injuries and one results in death, then a survivor's exclusive remedy is to recover damages under the Wrongful Death Act (*see* Doc. 103 at 4; Doc. 179 at 4 n.3) – even though a wrongful death action only encompasses damages caused by the injury that resulted in death, § 768.20, Fla. Stat. Under Defendants' interpretation of the law, the survivor would be precluded from recovering damages caused by any injury not resulting in death. To frame the argument differently, Defendants contend that the analysis should focus on whether the overall *course of conduct* resulted in death, and if so, the abatement clause precludes a survival action for *any* injury caused by that course of conduct. By contrast, Plaintiff contends the analysis should focus on whether the *injury* that is the subject of the action resulted in death. Plaintiff argues that the abatement clause precludes a survival action only with respect to the death-resulting injury. Under Plaintiff's interpretation, a survivor could recover wrongful death damages with respect to the injury that resulted in death as well as survival damages with respect to any injury that did not result in death. Both parties can marshal language from the case law that seemingly supports their positions. (*E.g.*, Doc. 178 at 5) (Defendants citing, *inter alia*, *Perkins*, 445 So. 2d at 1011) (holding "that the judgment for personal injuries rendered in favor of the injured party while living barred the subsequent wrongful death action based on the same tortious conduct."); (*but see* Doc. 116 at 3) (Plaintiff citing, *inter alia*, *Williams*, 471 So. 2d at 629) (the Wrongful Death Act "does not preclude a survival action for 'non-death-resulting injuries.'"). However, as both parties acknowledge, there is no Florida Supreme Court or appellate court decision directly on point, leaving this Court to make its best guess as to how the Florida Supreme Court would answer the question.[8]

---

[8]    In a 4-page order in *Shadd v. R.J. Reynolds Tobacco Co.*, Case No. 2008CA038631 (Fla. 15th Cir. Ct.), a state trial court did rule that a survivor could not recover survival damages for the decedent's non-fatal laryngeal cancer in addition to wrongful death damages for the decedent's

The Court agrees with Plaintiff that in determining when the abatement clause precludes a a survival action, the proper focus is on the *injury* that is the subject of the action and whether that injury resulted in death. The abatement clause does not preclude all survival claims any time the defendant's "course of conduct" caused the decedent's death. That is so, first and foremost, because Defendants' "course of conduct" approach finds no support in the text of the statute. The abatement clause provides: "When *a personal injury to the decedent results in death*, no action *for the personal injury* shall survive, and any such action pending at the time of death shall abate." (emphasis added).[9] The abatement clause makes no reference to whether the defendant's *course of conduct* resulted in death. The most natural reading of the statute is that when an injury results in the decedent's death, no action for the injury *that resulted in the decedent's death* shall survive. The clause does not mean that a survival action for an injury *that did not result in death* is extinguished. *Accord Williams*, 461 So. 2d at 629 (the Wrongful Death Act "does not preclude a survival action for 'non-death-resulting injuries.'").

---

fatal lung cancer. (Doc. 202-3). However, state trial court orders do not necessarily help predict how the Florida Supreme Court would rule on a certain issue. *Cf. Molinos Valle Del Cibao*, 633 F.3d at 1348 (in the absence of guidance from the Florida Supreme Court, a federal court should turn to intermediate appellate court decisions, unless the federal court is persuaded the Florida Supreme Court would rule differently).

In any event, for the reasons given in this Order, the Court believes that the Florida Supreme Court would reach a conclusion different from the trial court in *Shadd*. The Court also believes that the trial court's reliance on *Skyrme v. R.J. Reynolds Tobacco Co.*, 75 So. 3d 769 (Fla. 5th DCA 2011), was misplaced because *Skyrme* dealt with whether a personal representative must replead a personal injury claim as a wrongful death claim when a living plaintiff dies during the litigation. *Skyrme* did not address whether a survivor can recover both wrongful death and survival damages when a tortfeasor's conduct causes both fatal and non-fatal personal injuries.

[9]     Section 768.19 does state that a person shall be liable for damages "[w]hen the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person … and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued." § 768.19, Fla. Stat. However, this statute speaks only to the creation of a right of action for wrongful death, not when a survival action abates.

The sentence that precedes the abatement clause buttresses this interpretation. The sentence states that in a wrongful death action, the decedent's personal representative "shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, *caused by the injury resulting in death.*" § 768.20, Fla. Stat. (emphasis added). This statement means that a wrongful death action, by its nature, is an action for damages caused by the particular injury resulting in death, not an action for all damages caused by the tortfeasor's "course of conduct." If one purpose of the abatement clause is to prevent double-recovery, that purpose is not served by precluding a survivor from pursuing survival damages caused by non-death-resulting injuries, which are not covered by the Wrongful Death Act.

What is more, the Florida Supreme Court has said "the survival statute is still applicable to preserve other actions which the decedent may have brought or was bringing prior to his death." *Martin*, 314 So. 2d at 770 n.18. "Obviously, in *Martin*, the Supreme Court wished to continue one's right to maintain an action for damages where death was not the result of the injuries sustained." *Smith v. Lusk*, 356 So. 2d 1309, 1311 (Fla. 2d DCA 1978). If Mr. Harris had not died at all, he could have maintained a personal injury action against Defendants for the medical bills and pain and suffering caused by his non-fatal oral cavity cancer. If Mr. Harris had died of some cause other than lung cancer, such as a car accident, his survivors could have maintained a survival action to recover the damages caused by the oral cavity cancer. Yet, paradoxically, Defendants argue that *because* Mr. Harris died from lung cancer due to his addiction to cigarettes, his survivors must be precluded from recovering the damages caused by his non-fatal oral cavity cancer. (*See* Doc. 179 at 4 n.3). Defendants' reading of the abatement clause is irreconcilable with the notion that "the survival statute is still applicable to preserve other actions which the decedent may have brought or was bringing prior to his death." *Martin*, 314 So. 2d at 770 n.18.

14

"[T]he paramount purpose of the Florida Wrongful Death Act is to prevent a tortfeasor from evading liability for his misconduct when such misconduct results in death." *Perkins*, 445 So. 2d at 1012. But Defendants' reading of the abatement clause has the opposite effect. Under Defendants' interpretation, if a tortfeasor's single course of conduct causes multiple injuries, one of which results in death, the survivor would be precluded from recovering damages caused by any number of non-fatal injuries; the survivor's recovery would be limited to those damages caused by the injury resulting in death. (*See* Doc. 179 at 4 n.3) (arguing that the Court must eliminate the award of damages related to Mr. Harris's oral cavity cancer). Perversely, under Defendants' interpretation, the tortfeasor could *profit* from the fact that its conduct was so egregious that it caused the decedent's death. This case illustrates that perverse result. According to the jury, the damages caused by the non-fatal injury to Mr. Harris – oral cavity cancer – were $1,326,650.00, while the damages caused by the fatal injury – lung cancer – were only $400,000.00. Under Defendants' reading of the abatement clause, the fact that Mr. Harris died from lung cancer extinguishes Plaintiff's right to recover any portion of the $1,326,650.00 related to oral cavity cancer; Plaintiff's recovery is limited to the $400,000.00.[10] After accounting for comparative fault, Defendants would *profit* by $530,660.00 *because* their conduct caused Mr. Harris to die of lung cancer. That cannot be so, especially under a statutory scheme whose purpose is remedial and is to be construed liberally. § 768.17, Fla. Stat.

---

[10] It is easy to imagine a similar scenario repeating itself in other toxic tort cases. A person's exposure to a toxin may cause a chronic, long-term illness that does not result in death, but may also cause the person to develop an aggressive form of cancer that swiftly kills him. In such a case, the medical expenses and pain and suffering related to the chronic illness could exceed those related to the cancer that took the decedent's life. If the law were applied as Defendants suggest, the decedent's survivors would be precluded from recovering damages caused by the non-fatal chronic illness.

Accordingly, the Court remains persuaded that Plaintiff may recover both wrongful death damages caused by Mr. Harris's fatal lung cancer as well as survival damages caused by Mr. Harris's non-fatal oral cavity cancer.

### D. Whether Federal Law Preempts Plaintiff's Claims

Defendants argue that federal law impliedly preempts Plaintiff's claims for negligence and strict liability because the liability verdicts amount to a common law ban on cigarettes, which Defendants argue is contrary to Congress's intention to keep cigarettes on the market. (Doc. 178 at 7-12). The Eleventh Circuit rejected this argument in *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186-91 (11th Cir. 2017) (en banc), and therefore so does this Court.

Defendants also argue that the Federal Cigarette Labeling and Advertising Act ("Labeling Act"), 15 U.S.C. §§ 1331, *et seq.*, expressly preempts Plaintiff's claims to the extent her theory of liability is based on inadequate labeling or advertising after July 1, 1969. (Doc. 178 at 14-15) (citing, *inter alia*, *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 524 (1992)). The Labeling Act requires tobacco companies to include specific warnings on cigarette packages, but preempts any "requirement or prohibition based on smoking and health" from "be[ing] imposed under State law with respect to the advertising and promotion of any cigarettes." 15 U.S.C. § 1334(b); *Cipollone*, 505 U.S. at 520-24. However, the Labeling Act does not preempt other common law claims outside the scope of the preemption clause, *Cipollone*, 505 U.S. at 517, such as defective design claims, *id.* at 523. Plaintiff's negligence and strict liability claims were based primarily on the theory that Defendants designed, manufactured, and sold cigarettes that were unreasonably dangerous. (*See*

Doc. 5 at ¶¶ 27-80, 117-21, 132-35). Because Plaintiff's negligence and strict liability claims did not depend simply on a failure-to-warn theory, her claims are not preempted.[11]

## E. Whether Giving the *Engle* Findings Preclusive Effect Violated Defendants' Right to Due Process

Next, Defendants argue that by giving the *Engle* Phase I jury findings preclusive effect, the Court violated the Defendants' right to due process. (Doc. 178 at 12-13). The Eleventh Circuit Court of Appeals has rejected this argument repeatedly. *Burkhart v. R.J. Reynolds Tobacco Co.*, 884 F.3d 1068, 1091-93 (11th Cir. 2018) (affirming that giving preclusive effect to the *Engle* Phase I findings on fraudulent concealment and conspiracy to conceal did not violate due process); *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1181-86 (11th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 646 (2018) (affirming that giving preclusive effect to the *Engle* Phase I findings on negligence and strict liability did not violate due process); *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278, 1287 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 2727 (2014) ("The decision of the Supreme Court of Florida to give preclusive effect to the approved findings from Phase I did not arbitrarily deprive R.J. Reynolds of property without due process of law."). Therefore, this Court rejects the due process argument as well.

## F. Whether the Evidence Was Sufficient to Support Plaintiff's Claims

Finally, Defendants assert, in conclusory fashion, that the evidence was insufficient to support the jury's verdict for Plaintiff on her negligence and strict liability claims. (Doc. 178 at 13-14). With respect to strict liability, Defendants argue that Plaintiff failed to offer sufficient

---

[11]     The Labeling Act also preempts state-law claims for concealment, but only to the extent those claims rely on a state-law duty to disclose material facts through advertising and promotion. *See Cipollone*, 505 U.S. at 528. As the jury did not return a verdict for Plaintiff on her concealment and conspiracy-to-conceal claims, the Court need not address the effect of the Labeling Act's preemption clause on the intentional tort claims.

evidence identifying a defect in their cigarettes or proving that such defects proximately caused her injuries. With respect to negligence, Defendants argue that Plaintiff failed to offer sufficient evidence to prove

> that any Defendant (1) engaged in conduct that rendered its cigarettes not reasonably safe, (2) had a duty to warn of some specific hazard that was not known by Ms. Harris, (3) breached that or any other duty, (4) acted unreasonably or failed to provide warnings that the Defendants had a duty to provide, or (5) engaged in a negligent act or omission that proximately caused Mr. Harris's injuries.

(Doc. 178 at 14).

To the extent Plaintiff did not independently prove the "conduct" and "defect" elements of her negligence and strict liability claims, that is because she was entitled to rely on the preclusive effect of the *Engle* Phase I findings. *See Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 428 (Fla. 2013). Thus, Plaintiff was not required to independently prove the duty, breach, defectiveness, or "general causation" elements of her negligence and strict liability claims. All Plaintiff needed to prove was "(i) membership in the *Engle* class; (ii) individual causation, i.e., that addiction to smoking the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged; and (iii) damages." *Id.* at 430. The Eleventh Circuit approved this very procedure in *Walker*, 734 F.3d 1278, *supra*.

To the extent Defendants argue that Plaintiff failed to introduce sufficient evidence of causation, the Court disagrees. Dr. David Burns, one of Plaintiff's medical experts, testified at length that Mr. Harris's addiction to cigarettes caused his oral cavity cancer, COPD, stroke, and lung cancer. (*E.g.*, Doc. 151 at 142; Doc. 152 at 5-12, 20-21, 100-01). Dr. Burns also explained that he was able to rule out alternative explanations for Mr. Harris's lung cancer. (Doc. 152 at 9-12). The Court should grant judgment as a matter of law only where "the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary

verdict." *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). The court must "consider all evidence, and the inferences drawn therefrom, in the light most favorable to the nonmovant." *Bishop v. City of Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir. 2004) (citing *Carter*, 870 F.2d at 581). Defendants cannot overcome this demanding standard. The Court finds that Plaintiff introduced sufficient evidence of causation to sustain the verdict.

### III.    Defendants' Motion to Alter or Amend the Judgment

#### A.  Standard

Under Federal Rule of Civil Procedure 59(e), "the district court possesses the power ... to alter or amend a judgment after its entry." Fed. R. Civ. P. 59, Advisory Comm. Note to Subdivision (e). "The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King,* 500 F.3d 1335, 1343 (11th Cir. 2007) (quotations and citations omitted). This Court has interpreted those parameters to include "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *Lamar Advertising of Mobile, Inc. v. City of Lakeland, Fla.,* 189 F.R.D. 480, 489 (M.D. Fla. 1999). "The decision to alter or amend a judgment is committed to the sound discretion of the district court." *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992).

#### B.  Whether Defendants Are Entitled to an Offset Based on the Collateral Source Rule

Defendants' first argument in the Motion to Alter or Amend Judgment is that the Court must reduce the award of compensatory damages to reflect collateral source payments received by Mr. Harris. (Doc. 179 at 5-10). Defendants contend that the Court must reduce the award to reflect $1,019,709.79 in collateral source payments, consisting of $726,131.33 in discounted medical bills, *id.* at 6, and $293,578.46 "that private insurance providers paid ... on Mr. Harris's behalf in

connection with his survival claims," *id.* Plaintiff responds that Defendants are not entitled to a

setoff because Defendants failed to request a verdict form that separated medical expenses from

other compensatory damages (Doc. 183 at 5-8), and because Defendants failed to prove that Mr.

Harris's health insurer or healthcare provider lacked a right of subrogation (*id.* at 8-9).

> Florida's collateral source statute provides in pertinent part that

> [i]n any action ... in which liability ... is determined by the trier of fact and in which damages are awarded to compensate the claimant for losses sustained, the court shall reduce the amount of such award by the total of all amounts which have been paid for the benefit of the claimant, or which are otherwise available to the claimant, from all collateral sources; however, there shall be no reduction for collateral sources for which a subrogation or reimbursement right exists.

§ 768.76(1), Fla. Stat. In short, the collateral source statute "mandate[es] post-trial setoff for money

received from collateral sources." (Doc. 122 at 2). Collateral sources include payments made

pursuant to a health insurance policy, § 768.76(2)(a)1, and pursuant to any contract to pay for

hospital or healthcare services, § 768.76(2)(a)3. Contractual write-offs given by a healthcare

provider qualify as a collateral source payment. *Goble v. Frohman*, 901 So. 2d 830, 833 (Fla.

2005). Under Federal Rule of Civil Procedure 8(c), a defendant must plead collateral source setoffs

as an affirmative defense. *Hassan v. United States Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988).

As with any other affirmative defense, the defendant bears the burden of proving entitlement to a

collateral source offset. *See In re Jennings*, 670 F.3d 1329, 1332 n.1 (11th Cir. 2012) (quoting *Int'l*

*Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006)).

Collateral benefits cannot be subtracted from the total verdict, but must be subtracted only

"from the 'portion of a verdict representing the same item of damages.'" *Griffin v. Philip Morris*

*USA, Inc.*, 730 F. App'x 848, 851 (11th Cir. 2018) (quoting *Ganley v. United States*, 878 F.2d

1351, 1353-54 (11th Cir. 1989)). Thus, for example, payments made by a health insurance provider

may be offset against the portion of the verdict representing hospital expenses, but not against the

portion of the verdict representing pain and suffering. *See Ganley*, 878 F.2d at 1355 ("It makes no sense to diminish Ganley's recovery for pain and suffering and lost wages simply because he had the foresight to purchase insurance for his medical expenses."). For that reason, "[i]f a defendant desires to preserve the right to a ... setoff, then an itemized verdict should be used to enable the actual economic damages to be ascertained without speculation." *Johnson v. LaSalle*, 774 So. 2d 760, 761 (Fla. 4th DCA 2000).

In this case, Defendants did not seek an itemized verdict form. Nor did Defendants object to the verdict form insofar as it called on the jury to return a general award of compensatory damages. Thus, when the jury determined that the compensatory damages for Mr. Harris's oral cavity cancer and lung cancer were $1,326,650.00 and $400,000.00, respectively, the verdict did not specify what amounts, if any, were for medical expenses and what amounts were for pain and suffering.

Defendants are not entitled to an offset because this case is analogous to *Griffin*, 730 F. App'x 848. Like the district court in *Griffin*, this Court finds that "'amend[ing] the judgment as Defendant[s] request[ ] would be an exercise in impermissible speculation' because '[t]he general verdict returned by the jury does not state how much, if any, the jury awarded Plaintiff for past medical expenses.'" *Id.* at 850 (quoting *Griffin v. Philip Morris USA, Inc.*, No. 3:09-cv-11128, D.E. 113 at 5 (M.D. Fla. Sep. 15, 2014)).

Defendants insist they are still entitled to the full amount of the offset because the jury awarded $1,326,650.00 in compensatory damages on the survival claim, which happened to be the full amount of Plaintiff's medical expenses (about $1,126,650) plus $200,000.00. (Doc. 179 at 9). Thus, Defendants suggest, the compensatory damages verdict on the survival claim must have encompassed $1,126,650 in medical expenses, which is subject to a collateral source offset. But

the Eleventh Circuit implicitly rejected a similar argument in *Griffin*. In that case, the parties reached a stipulation about the plaintiff's medical bills and the district court instructed the jury that the total amount of the plaintiff's past medical expenses was $584,200.53. *Griffin*, 730 F. App'x at 850. The jury eventually returned a general compensatory damages verdict of $1,268,402. *Id.* However, the Eleventh Circuit did not assume that the general damages award must have subsumed the stipulated amount of medical expenses (which would have been subject to an offset). Rather, the Eleventh Circuit held that the district court properly refused to reduce the verdict by the collateral source payments. *Id.* at 851. The Eleventh Circuit explained that because the defendant failed to obtain a special verdict, the interest in avoiding speculation justified the district court's refusal to apply a collateral source offset. *Id.* (citing *Johnson*, 774 So. 2d at 761). As the Fourth District Court of Appeal held, "[t]he two-issue rule bars a party from contending that the undifferentiated award of total damages represents all or any part of plaintiff's economic damages." *Johnson*, 774 So. 2d at 761 (citing *Odom v. Carney*, 625 So. 2d 850, 851 (Fla. 4th DCA 1993), and *Barhoush*, 452 So. 2d at 1077).

Defendants also argue that Plaintiff is precluded from arguing that the general verdict format prevents any setoff because the parties "stipulated that all issues of setoff should be addressed post-verdict." (Doc. 179 at 8). During trial, Plaintiff sought to prove Mr. Harris's medical expenses by admitting a chart summarizing his billing records. Defendants objected on the ground that the chart inflated Mr. Harris's medical expenses by listing the amounts *billed* to Mr. Harris, not the amounts he actually paid. (*Id.* at 2) (citing Doc. 154 at 4-14). Plaintiff countered that "[a]dmitting only the reduced or contractual amount of Mr. Harris's medical bills is tantamount to admitting impermissible collateral source evidence," and that "[a]ny set-off for the discounted or contractual amount of a bill is within the province of the Court, not the jury, and is

properly calculated post-trial." (Doc. 122 at 1).[12] Subject to the understanding that after trial the Court would reduce any award for medical expenses by the amount of collateral source payments, the parties agreed on the amount of medical expenses to be included in Plaintiff's chart. (*See* Doc. 179 at 3). Defendants argue that because the parties agreed that the Court would address collateral source offsets post-trial, Plaintiff is essentially estopped from opposing Defendants' motion for an offset.

Defendants' argument is a red herring. The fact that Plaintiff argued, and the Court ruled, that the issue of collateral-source offsets should be handled after the trial did nothing to prevent Defendants from requesting an itemized verdict form. Defendants were still free to request an itemized verdict form, which would have enabled the Court to identify which portions of the compensatory damages, if any, were subject to an offset. But Defendants did not make such a request. As a result, the Court is unable to differentiate, without speculating, which portion of the verdict is for medical expenses and which portion is for pain and suffering. To borrow Plaintiff's words, "it is simply too late to unscramble these eggs." (Doc. 183 at 1).

Accordingly, the Court finds that, just like in *Griffin*, the jury's general damages verdict prevents the Court from being able to apply any reduction for collateral source payments.[13] To this extent, Defendants' Motion to Alter or Amend the Judgment is due to be denied.

---

[12] Plaintiff was correct in so arguing. "[C]ollateral source evidence may not be introduced before the jury," and application of collateral source offsets must be handled by the court after entry of the verdict. *Sheffield v. Superior Ins. Co.*, 800 So. 2d 197, 200 n.3 (Fla. 2001).

[13] Based on this ruling, the Court need not reach the issue of whose burden it is to prove that the insurer lacked a right of subrogation and whether that party met its burden.

## C. Whether the Judgment Must Be Amended to Reflect Mr. Harris' Comparative Fault

Finally, Defendants argue that the Court must amend the judgment to reflect the degree of comparative fault that the jury attributed to each party. (Doc. 179 at 10-12).[14] As noted, the jury found for Plaintiff on her negligence and strict liability claims, but not on her fraudulent concealment and conspiracy-to-conceal claims. The jury awarded $1,326,650.00 in survival damages related to Mr. Harris's oral cavity cancer (Doc. 143 at 12 ¶ 17), apportioning 60% of the fault to Mr. Harris, 15% each to Philip Morris and R.J. Reynolds, and 10% to Lorillard (*id.* at 3 ¶ 5). The jury awarded $400,000.00 in wrongful death damages related to Mr. Harris's lung cancer (*id.* at 12 ¶ 16), apportioning 70% of the fault to Mr. Harris and 10% each to Philip Morris, R.J. Reynolds, and Lorillard (*id.* at 4 ¶ 7). The original judgment reflected the total amount of compensatory damages – $1,726,650.00 – which did not account for the degree of Mr. Harris's comparative fault pursuant to § 768.81(3), Fla. Stat. Plaintiff agrees that the judgment must be amended to reflect Mr. Harris's comparative fault. (Doc. 183 at 9-10).

The Court agrees as well. The judgment is due to be amended to reflect each Defendant's liability to Mr. Harris as follows:

1. **R.J. Reynolds: $238,997.50** = ($1,326,650 x 0.15) + ($400,000 x 0.10)

2. **Philip Morris: $238,997.50** = ($1,326,650 x 0.15) + ($400,000 x 0.10)

3. **Lorillard: $172,665.00** = ($1,326,650 x 0.10) + ($400,000 x 0.10)

The total judgment for Mr. Harris is thus $650,660.00.

---

[14]     Defendants also argue that to properly calculate damages, the Court must first reduce the judgment by Mr. Harris's fault, *then* deduct collateral source payments. (Doc. 179 at 12-13). However, the Court does not reach this argument because it has ruled that Defendants are not entitled to a collateral source offset.

## IV.    Conclusion

For the reasons set forth above, the Court affirms its prior rulings that Mr. Harris qualifies as a member of the *Engle* class and that Plaintiff may recover both wrongful death and survival damages under the circumstances of this case. Defendants are not entitled to the application of collateral source offsets, but the judgment is due to be amended to reflect each party's degree of comparative fault. Accordingly, it is hereby **ORDERED**:

1.  Defendants' Renewed Motion for Judgment as a Matter of Law on All Claims and alternative Motion for New Trial (Doc. 178) is **DENIED**.

2.  Defendants' Motion to Alter or Amend Judgment (Doc. 179) is **GRANTED** to the extent that the Court will amend the judgment to reflect each party's degree of comparative fault. An amended judgment will be entered in favor of Plaintiff and against each Defendant as follows:

    a.  Against Philip Morris USA in the amount of **$238,997.50**.

    b.  Against R.J. Reynolds in the amount of **$238,997.50**.

    c.  Against Lorillard in the amount of **$172,665.00**.

3.  Otherwise, Defendants' Motion to Alter or Amend Judgment is **DENIED**.

4.  The Court defers ruling on Plaintiff's Motion for Attorneys' Fees (Doc. 176) until any appeal in this case is resolved.

**IT IS SO ORDERED**.

4-15-2019
**DATE**

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**